[Cite as *Darcy v. Med. Univ. of Toledo*, 2010-Ohio-5905.]

# Court of Claims of Ohio

The Ohio Judicial Center
65 South Front Street, Third Floor
Columbus, OH 43215
614.387.9800 or 1.800.824.8263
www.cco.state.oh.us

DEBORAH DARCY, et al.

     Plaintiffs

     v.

MEDICAL UNIVERSITY OF OHIO AT TOLEDO

     Defendant
     Case No. 2006-01092

Judge Joseph T. Clark
Magistrate Holly True Shaver

MAGISTRATE DECISION

{¶ 1} Plaintiffs brought this action alleging medical negligence and lack of informed consent. The issues of liability and damages were bifurcated and the case proceeded to trial on the issue of liability.

{¶ 2} On November 18, 2003, plaintiff, Deborah Darcy,[1] suffered personal injury when she tripped and fell in a parking lot, striking her right shoulder on the bumper of a parked vehicle. Plaintiff testified that on the date of the injury, she was on her way to a work-related meeting. At the time of impact, plaintiff felt her shoulder "snap." Immediately afterward, plaintiff could not lift her arm and she suspected that she had dislocated her shoulder. Plaintiff was taken to Mercy Memorial Hospital in Monroe, Michigan, where x-rays that were taken revealed no broken bones. Plaintiff was discharged from the hospital and was instructed to see her family physician.

---

[1]"Plaintiff" (used in the singular form) shall be used to refer to Deborah Darcy throughout this decision.

**{¶ 3}** Because the injury happened while plaintiff was working, she was instructed to file a federal workers' compensation claim.[2] On November 21, 2003, plaintiff was referred to Dr. Telles through a "Work Well Occupational Medicine" program. Dr. Telles ordered an MRI of plaintiff's right shoulder, which was performed on December 2, 2003. On December 4, 2003, plaintiff saw Dr. Telles for a follow-up appointment, during which time the MRI was discussed. The MRI report interpretation revealed a full-thickness tear of both the subscapularis and the supraspinatus tendons, and a medially displaced biceps tendon. (Joint Exhibit B, Volume 1, Flower Hospital records.) Plaintiff was referred to Kenneth McNamee, M.D., an orthopedic surgeon. On December 11, 2003, Dr. McNamee wrote plaintiff a prescription for an office appointment with Dr. Henry Goitz, a physician at defendant's medical center, to evaluate and treat her for "subscapularis and distal aspect subscapularis tear - displaced biceps tendon." (Joint Exhibit B, Volume 1, office records of Dr. McNamee.)

**{¶ 4}** On December 17, 2003, plaintiff took her MRI films, a copy of the MRI report, and her prescription to Dr. Goitz. A copy of the MRI report was also faxed to Dr. Goitz's office. Dr. Goitz prescribed physical therapy and informed plaintiff that he would schedule surgery after January 1, 2004. On February 12, 2004, Dr. Goitz performed an arthroscopic repair of the supraspinatus tendon.

**{¶ 5}** On May 3, 2004, Dr. Goitz took x-rays of plaintiff's shoulder which revealed anterior prominence. On May 12, 2004, plaintiff had an MR arthrogram and a CT scan taken of her shoulder. Dr. Goitz performed a second surgery on June 15, 2004, but on June 21, 2004, plaintiff's shoulder was again found to be dislocated. On June 29, 2004, Dr. Goitz performed a "Bankhart repair" on plaintiff's shoulder. However, on July 7, 2004, plaintiff's shoulder was again found to be dislocated. On July

---

[2]Plaintiff was employed by the United States Postal Services as a manager of post office operations in Detroit, Michigan.

14, 2004, Dr. Goitz performed a closed reduction of plaintiff's shoulder.  Subsequently, Dr. Goitz referred plaintiff to Joseph Iannotti, M.D., for a second opinion.

{¶ 6}  Plaintiff took the December 2, 2003 MRI films to Dr. Iannotti, who ordered another MRI of her shoulder.  Dr. Iannotti recognized that the original MRI from December 2, 2003, showed that plaintiff had torn three tendons of her rotator cuff and that only the supraspinatus tendon had been repaired.  Dr. Iannotti later performed a total joint replacement because plaintiff's subscapularis tendon was not repairable at that time.

{¶ 7}  Plaintiffs assert that Dr. Goitz's treatment of plaintiff fell below the standard of care when he failed to identify and repair the torn subscapularis tendon and the displaced biceps tendon during the February surgery.  Plaintiffs further assert that Dr. Goitz negligently failed to recognize that those identical injuries were still present as shown on the MR arthrogram taken in May.


**LAW**

"In order to establish medical malpractice, it must be shown by a preponderance of the evidence that the injury complained of was caused by the doing of some particular thing or things that a physician or surgeon of ordinary skill, care and diligence would not have done under like or similar conditions or circumstances, or by the failure or omission to do some particular thing or things that such a physician or surgeon would have done under like or similar conditions and circumstances, and that the injury complained of was the direct result of such doing or failing to do some one or more of such particular things."  *Bruni v. Tatsumi* (1976), 46 Ohio St.2d 127, paragraph 1 of the syllabus.


**HENRY GOITZ, M.D.**

Henry Goitz, M.D., testified that he is board-certified in orthopedic surgery, that rotator cuff injuries constitute a significant percentage of his practice, and that he has

performed approximately 100 shoulder surgeries per year for the past 17 years. Dr. Goitz stated that when he first began to perform shoulder surgeries, they were performed "open" but now he performs most of them via arthroscope. Dr. Goitz stated that the three factors for an optimal surgical outcome are the quality of the tissue, the patient, and the physical therapist.

Dr. Goitz had no specific recollection of his initial examination of plaintiff. Dr. Goitz stated that the December MRI demonstrates a biceps, subscapularis and supraspinatus tear. Dr. Goitz stated that he more than likely did look at the report from the MRI, but that he usually does not review the films, because he defers to the expertise of the radiologist who writes the interpretation. Dr. Goitz also acknowledged that he probably saw the prescription that plaintiff presented from Dr. McNamee. Dr. Goitz agreed that a rotator cuff injury may involve any of the four tendons in the rotator cuff.

According to Dr. Goitz, plaintiff had suffered a rotator cuff tear and he planned to examine the severity of it via arthroscopic surgery. He testified that prior to surgery, he suspected a supraspinatus tear and possibly a subscapularis tear because of the MRI report. Dr. Goitz stated that on the day of the February surgery, he obtained plaintiff's consent to perform either an arthroscopic or an open procedure. Dr. Goitz testified that he chose to perform the surgery arthroscopically, that it was his duty to fully assess and examine the entire shoulder joint during the surgery, and that there was no evidence of a subscapularis tear on the day of the surgery. He stated that his intraoperative evaluation demonstrated no subscapularis tear and no biceps displacement despite the findings in the December MRI report. Dr. Goitz also stated that there was no reason to convert the surgery from arthroscopic to open, that he did not find osteoarthritis in plaintiff's shoulder, and that there was no significant "wear and tear" in plaintiff's shoulder.

Dr. Goitz admitted that the MRI showed two additional tendon tears but he did not find them intraoperatively. Dr. Goitz also stated that there was nothing that impeded him from seeing plaintiff's entire shoulder joint during the arthroscopic procedure. He further stated that, although the standard of care does not require intraoperative photos, he did take such photos; that his normal practice was to show the patient and her family the photos; but that the photos would not become part of the patient's medical file and would eventually be discarded.

Dr. Goitz opined that his overall care of plaintiff met the standard of care, but that plaintiff suffered a rapid onset of arthritic changes. Dr. Goitz also opined that his care did not cause subsequent subluxation of plaintiff's shoulder. Dr. Goitz described plaintiff's condition as "idiopathic chondrolysis," or unknown cartilage wear in a short period of time. Dr. Goitz stated that plaintiff had significant, aggressive, degenerative changes in her shoulder from February to May, and opined that plaintiff's condition was a "rare and unusual event."

**GLENN TUNG, M.D.**

Plaintiffs' first expert, Glenn Tung, M.D., a professor of diagnostic imaging at Brown University, testified that he is board-certified in internal medicine, radiology, and neuroradiology. Dr. Tung examined the December 2, 2003 MRI, the May 12, 2004 CT scan, and the May 12, 2004 MR arthrogram of plaintiff's shoulder. Dr. Tung explained that an MRI is useful to identify soft tissue injuries and that a CT scan is useful to identify bone injuries. Dr. Tung further stated that an MR arthrogram is an imaging of the joint, where a small amount of liquid contrast is injected to identify the tendons, ligaments, and muscles. Dr. Tung explained that the rotator cuff is comprised of four tendons: 1) supraspinatus (the most commonly torn); 2) infraspinatus; 3) teres minor; and 4) subscapularis. Dr. Tung opined that the December MRI showed a tear of the subscapularis, a tear of the supraspinatus, and a dislocation of the biceps tendon. Dr. Tung further stated that a biceps tear is indirect evidence of a

subscapularis tear and that the December MRI showed both a subscapularis tear of approximately 2-3 cm, and a supraspinatus tear of approximately 1 cm. Dr. Tung also stated that subluxation of the shoulder is a sign of a subscapularis tear, and that nothing in the December MRI would have made it difficult to diagnose the torn subscapularis.

Dr. Tung opined that the May MR arthrogram showed that the subscapularis tendon remained torn. Dr. Tung acknowledged that an isolated tear of the subscapularis tendon is fairly rare, and that 2 to 3.5 percent of all rotator cuff tears involve the subscapularis tendon.

**ROBERT CIRINCIONE, M.D.**

Plaintiffs' second expert, Robert Cirincione, M.D., testified that he is board-certified in orthopedic surgery, with a specialty in sports medicine, and that he treats a number of athletes with shoulder injuries related to activities that involve overhead-throwing, such as water polo, volleyball, and baseball. Dr. Cirincione explained that in his practice, he uses an arthroscope to take intraoperative photos of a patient's shoulder prior to performing surgery and that the photos become part of the patient's file. Dr. Cirincione stated that he stopped performing surgeries on January 1, 2007, but that from 1988-2007, his practice was limited to knee and shoulder surgeries. Dr. Cirincione stated that an orthopedic surgeon has an obligation to fully evaluate the nature and extent of a shoulder injury, and that if a surgeon performs an arthroscopic evaluation, he should use a camera to document his findings. Dr. Cirincione also stated that if Dr. Goitz had a problem visualizing the tendons in the shoulder during surgery, he was obligated to convert from an arthroscopic to an open procedure.

Dr. Cirincione stated that Dr. Goitz's failure to review the December MRI films was below the standard of care. Dr. Cirincione explained that an MRI is the "gold standard" to identify soft tissue structures. Dr. Cirincione opined that plaintiff sustained

injury to her supraspinatus, subscapularis, and her biceps tendon as a result of her fall on November 18, 2003.

Based upon the medical literature and his experience in treating patients, Dr. Cirincione opined that on February 12, 2004, it was not too late to repair plaintiff's shoulder, and that if all three tendons had been repaired at that time, her prognosis would have been "good" to "excellent." Dr. Cirincione noted that Dr. Goitz's operative report mentions a supraspinatus tear but does not mention an examination of the subscapularis or the biceps tendon. (Joint Exhibit B, Volume 1, office records of Dr. Goitz.) Dr. Cirincione opined that Dr. Goitz's failure to identify and repair the subscapularis and biceps tendons at the time of the February 12, 2004 surgery was a deviation from the standard of care.

Dr. Cirincione also stated that subsequent to the initial surgery, plaintiff developed an unstable shoulder because the head of the humerus drifted, and that condition can cause osteoarthritis. Dr. Cirincione opined that if plaintiff's shoulder had been repaired properly, she would not have developed osteoarthritis. In addition, Dr. Cirincione agreed that by July 2004, it was too late to repair the subscapularis tendon because it had lost elasticity and could not be stretched for repair. Dr. Cirincione further opined that plaintiff's mal-positioned shoulder was caused by Dr. Goitz's failure to repair the other two tendons in the February surgery, and that plaintiff has sustained permanent injuries as a result.

Dr. Cirincione acknowledged that several factors affect rotator cuff repairs, including the age of the patient, the degree of retraction, and the strength of the tendons. Dr. Cirincione opined that it is not below the standard of care to perform an arthroscopic repair of a rotator cuff, but stated that a subscapularis repair is more difficult to perform via arthroscope. Dr. Cirincione further acknowledged that the supraspinatus tendon is the most commonly torn tendon in a rotator cuff injury. However, he stated that the December MRI clearly showed that plaintiff had 3 separate tendon tears. According to Dr. Cirincione, the December MRI showed that the shoulder

was not mal-aligned, but the CT scan in May showed that the shoulder had become mal-aligned.  Dr. Cirincione opined that the humeral head dislocation was the proximate result of the untreated subscapularis tear.

Dr. Cirincione also stated that the surgeries that Dr. Goitz performed after February 2004 were unsuccessful because of Dr. Goitz's failure to initially repair the subscapularis and biceps tendons.

## JOSEPH P. IANNOTTI, M.D.

Plaintiffs' third expert, Joseph P. Iannotti, M.D., Ph.D., testified that he is a professor of orthopedic surgery and chairman of the orthopedic and rheumatologic institute at the Cleveland Clinic, and that he is board-certified in orthopedic surgery.  Dr. Iannotti stated that he has written several textbook chapters on the shoulder that include radiology, four to five peer-reviewed articles on MRI of the shoulder, and one of the more definitive articles on the diagnosis of rotator cuff tears using MRI.  Dr. Iannotti stated that he performs approximately 250 shoulder surgeries per year, and estimated that he performs approximately 80 percent of those surgeries arthroscopically and 20 percent by open procedure.

Dr. Iannotti testified that he reviewed both the December MRI as well as the May 12, 2004 CT scan and MR arthrogram.  Dr. Iannotti agreed with the radiologist's opinion that the December 2, 2003 MRI showed a very large tear of two tendons: both the supraspinatus and the subscapularis.  Dr. Iannotti described the December MRI as "good quality" and that it yielded a "very clear" diagnosis.  Dr. Iannotti stated that the surgery to repair the entire rotator cuff could have been performed either open or arthroscopically.

In Dr. Iannotti's opinion, it was clear in both the December and May films that the subscapularis tendon was torn and retracted.  Dr. Iannotti stated that, in general, scar tissue can obstruct the view of tendons on an MRI, but that in this case, scar tissue did

not obstruct the view of a torn subscapularis tendon.  Dr. Iannotti added that the May 12, 2004 radiology report would alert a reasonable physician to the possibility of a torn subscapularis tendon because it is very difficult to get anterior superior escape of fluid or anterior subluxation without having a significant deficiency in subscapularis.  Dr. Iannotti also noted that with plaintiff's history of having a rotator cuff tear with a repair, an orthopedic surgeon would be highly suspicious of either a torn or deficient subscapularis tendon.

Dr. Iannotti also stated that if a rotator cuff tear is repaired within three months of the injury, it is more likely than not a more effective repair with a better likelihood of healing than a surgery performed more than three months after the injury.

Finally, Dr. Iannotti testified that on November 4, 2004, he performed a muscle transfer as a reconstructive surgery on plaintiff's shoulder because the subscapularis tendon was not repairable at that time.


**MICHAEL D. ROBACK, M.D.**

Defendant's expert, Michael D. Roback, M.D., testified that he is board-certified in orthopedic surgery but that he stopped performing surgeries in April or May 2004.[3] Prior to that time, he performed approximately 20 surgeries per week, and estimated that he performed at least three shoulder surgeries per month.  Dr. Roback testified that he was familiar with the standard of care for rotator cuff surgery: repair the tear and reattach the tendon to the bone.  Dr. Roback opined that Dr. Goitz's treatment of plaintiff met the standard of care with respect to the February 12, 2004 surgery.  Dr. Roback based his opinion on Dr. Goitz's operative note that states "[n]o intra-articular pathology other than identification of a rotator cuff questionable tear."  (Joint Exhibit B, Volume I, office records of Dr. Goitz.)  Dr. Roback opined that Dr. Goitz's note means that he did

_____

[3]Although Dr. Roback became board-certified in orthopedic surgery in 1974 and had stopped performing surgery in April or May 2004, his testimony convinces the court that he is competent to testify as an expert pursuant to Evid.R. 601(D) and 702.  Therefore, plaintiffs' October 19, 2010 motion to exclude Dr. Roback's testimony is DENIED.

not see any other damage to the rotator cuff.  Dr. Roback opined that Dr. Goitz's failure to discover the other tendon tears and to convert from an arthroscopic to an open procedure was not below the standard of care inasmuch as it becomes more difficult as time passes from the date of injury to see such tears.  Dr. Roback did not believe that the multiple surgeries caused plaintiff to suffer subsequent subluxations, but he agreed that hypothetically, not repairing the subscapularis tendon could allow for further subluxation of the shoulder.  In summary, Dr. Roback stated that if Dr. Goitz had seen the tendon tears but failed to repair them, that such treatment would be a deviation from the standard of care.  However, Dr. Roback opined that the subscapularis tear must not have been detectable during the February surgery.

Dr. Roback conceded that plaintiff probably had a torn supraspinatus, subscapularis and biceps tendon with her initial injury, and that those injuries existed during the February surgery.  Dr. Roback felt that there must have been scarring that prevented Dr. Goitz from not visualizing the biceps and subscapularis tear during the February surgery; otherwise he did not see any other reasonable explanation for Dr. Goitz's failure to recognize those two tears.  Dr. Roback stated that plaintiff had unique clinical features, and that Dr. Goitz "did everything he could but just missed it."  Dr. Roback agreed that failure to repair the subscapularis tendon allowed plaintiff's shoulder to become displaced.  Dr. Roback conceded that the May MR arthrogram shows a full-thickness tear of the subscapularis tendon, but noted that Dr. Goitz did not recognize or suspect a torn subscapularis tendon at that time.

**MICHAEL J. POTCHEN, M.D.**

Michael J. Potchen, M.D., testified that he was a diagnostic radiologist, and that he has a certificate of added qualifications in neuroradiology.  Dr. Potchen opined that the May MR arthrogram of the shoulder was required by the standard of care and that the radiologist's report sufficiently communicated the presence of a full thickness tear of

the subscapularis tendon in conclusion number 2, "pronounced anterior subluxation with some cephalic migration is present, accompanied by labral tear and posterior inner position of soft tissue along the joint space." Dr. Potchen further stated that the pronounced anterior subluxation is synonymous with a full- thickness tear of the subscapularis tendon because "that has to be present for that position to occur." According to Dr. Potchen, the extravasation of the intra-articular contrast material into the anterior soft tissues of the shoulder was a finding secondary to a tear of the subscapularis tendon and anterior capsule. Dr. Potchen agreed that a tear of the subscapularis tendon is present on both the December MRI and the May MR arthrogram.

## FINDINGS

### Medical Negligence

Upon review of all the evidence submitted, the court finds that the testimony of plaintiffs' medical experts was more persuasive than the testimony of defendant's experts. Based upon the testimony of Drs. Cirincione, Tung, and Iannotti the court finds that the December MRI clearly showed a tear of both the supraspinatus and the subscapularis tendon and a displaced biceps tendon, consistent with the radiologist's reports. The court further finds that the standard of care required Dr. Goitz to accurately diagnose the injuries to plaintiff's shoulder prior to surgery. The court notes that Dr. Goitz made no finding in his February 12, 2004 operative report regarding the suspected injuries to either the subscapularis or the biceps tendon. Although Dr. Goitz testified that he fully examined plaintiff's rotator cuff using the arthroscope during surgery and the subscapularis tendon was not torn and that the biceps tendon was not displaced, the court does not find his testimony to be credible in that regard. Rather, given the expert testimony and MRI, the court finds that Dr. Goitz failed to discover the injuries either because he failed to carefully examine the area or he simply "missed" them.

The court finds that a physician of ordinary skill, care and diligence would have fully explored plaintiff's shoulder joint to verify whether the findings in the December MRI report were valid or erroneous. The court further finds that if Dr. Goitz could not identify either the subscapularis or the biceps tendon with an arthroscope, the standard of care dictated that the procedure be converted from arthroscopic to open. In short, Dr. Goitz breached the standard of care by not thoroughly evaluating the injuries to plaintiff's shoulder either prior to or during the February surgery. As a further result of Dr. Goitz's failure to identify and repair plaintiff's torn subscapularis tendon, plaintiff developed an anterior prominence of her shoulder, endured two other unsuccessful surgical procedures performed by Dr. Goitz, and was then required to undergo a total joint replacement performed by Dr. Iannotti.

In summary, the court finds that Dr. Goitz breached the standard of care owed to plaintiff, and judgment is recommended in favor of plaintiffs on their claims of medical negligence.

**Lack of Informed Consent**

"The tort of lack of informed consent is established when: (a) The physician fails to disclose to the patient and discuss the material risks and dangers inherently and potentially involved with respect to the proposed therapy, if any; (b) the unrevealed risks and dangers which should have been disclosed by the physician actually materialize and are the proximate cause of the injury to the patient; and (c) a reasonable person in the position of the patient would have decided against the therapy had the material risks and dangers inherent and incidental to treatment been disclosed to him or her prior to the therapy." *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 139.

Upon review of the evidence presented at trial, the court finds that plaintiffs have failed to prove their claim of lack of informed consent by a preponderance of the evidence. Dr. Goitz testified that he obtained a written consent signed by plaintiff

regarding the February 2004 surgery. Plaintiffs did not present testimony to the contrary or any other evidence that her consent, though voluntarily given, was not informed consent. Therefore, the court finds that plaintiffs have failed to prove their claim of lack of informed consent.

On another matter, the court further finds that plaintiff did not do, or fail to do, anything that was asked or required of her in the exercise of reasonable care for her own health and well-being. Although defendant has asserted that the delay in plaintiff's medical approval from the federal bureau of workers' compensation added to the delay in treatment of her shoulder, the court finds that credible expert testimony by Drs. Cirincione and Iannotti showed that if all three tendons had been repaired in February 2004, plaintiff's prognosis would have been good to excellent. Therefore, any argument of comparative negligence is not persuasive. Judgment is recommended in favor of plaintiffs in an amount to be determined at the trial on the issue of damages.

*A party may file written objections to the magistrate's decision within 14 days of the filing of the decision, whether or not the court has adopted the decision during that 14-day period as permitted by Civ.R. 53(D)(4)(e)(i). If any party timely files objections, any other party may also file objections not later than ten days after the first objections are filed. A party shall not assign as error on appeal the court's adoption of any factual finding or legal conclusion, whether or not specifically designated as a finding of fact or conclusion of law*
*under Civ.R. 53(D)(3)(a)(ii), unless the party timely and specifically objects to that factual finding or legal conclusion within 14 days of the filing of the decision, as required by Civ.R. 53(D)(3)(b).*

_____
HOLLY TRUE SHAVER
Magistrate

cc:

Anne B. Strait                              Gerald S. Leeseberg
Brian M. Kneafsey Jr.                       175 South Third Street
Assistant Attorneys General                Penthouse One
150 East Gay Street, 18th Floor            Columbus, Ohio 43215-5134
Columbus, Ohio 43215-3130

HTS/cmd
Filed November 8, 2010
To S.C. reporter December 1, 2010